UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
NO. 7:11-CR-61-BR
NO. 7:15-CV-68-BR

| | |
|---|---|
| REGGIE ANDRE BECKTON,<br> Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br> Respondent. | ORDER |

  This matter is before the court for initial review of a 28 U.S.C. § 2255 motion pursuant to Rule 4 of the Rules Governing Section 2255 Proceedings. Under this Rule, "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion . . . ." R. Gov. § 2255 Pro. 4(b).

  In May 2011, petitioner was charged by way of indictment with one count of bank robbery in violation of 18 U.S.C. § 2113(a) and one count of bank robbery and aiding and abetting the same in violation of 18 U.S.C. §§ 2 and 2113(a). After petitioner underwent a psychiatric evaluation and after multiple continuances necessitated by three changes in defense counsel, petitioner ultimately proceeded to trial, representing himself, in September 2012. In January 2013, the court sentenced petitioner to a total term of 300 months imprisonment. Petitioner appealed. By mandate issued 27 February 2014, the Fourth Circuit Court of Appeals affirmed this court's judgment. (DE ## 263, 268.) Petitioner then filed a petition for a writ of certiorari, which the Court denied 19 May 2014. Beckton v. United States, No. 13-9757 (U.S.). On 7 April 2015, petitioner timely filed the instant § 2255 motion. (DE # 308.)

In his § 2255 motion, petitioner asserts five claims. The court addresses each claim in turn.

First, petitioner argues that his right to effective assistance of counsel was violated when the court forced him to choose between proceeding with conflicted counsel and appearing pro se. (Mot., DE # 308-1, at 4-5.) He contends that substitute counsel should have been appointed. (See id.)

"The determination of whether or not the motion for substitution of counsel should be granted is within the discretion of the trial court and the court is entitled to take into account the countervailing . . . interest in proceeding on schedule." United States v. Gallop, 838 F.2d 105, 108 (4th Cir. 1988) (citation omitted). "In cases where a district court has denied a request by a defendant to replace one court-appointed lawyer with another court-appointed lawyer, th[e appellate court] considers three factors to determine whether the initial appointment ceased to constitute Sixth Amendment assistance of counsel: (1) the timeliness of the motion; (2) the adequacy of the court's subsequent inquiry; and (3) whether the attorney/client conflict was so great that it had resulted in total lack of communication preventing an adequate defense." United States v. Horton, 693 F.3d 463, 466-67 (4th Cir. 2012) (internal quotation marks and citation omitted). "[O]nce the trial court has appropriately determined that a substitution of counsel is not warranted, the court can insist that the defendant choose between continuing representation by his existing counsel and appearing *pro se*." Gallop, 838 F.2d at 109 (citations omitted).

On 4 September 2012, during his arraignment hearing, petitioner claimed a conflict of interest existed between him and Thomas Manning, Esq., (DE # 253, at 4-5), who was the third attorney appointed to represent petitioner at trial. Petitioner wanted Manning to withdraw and another attorney appointed to represent him. (See id. at 9, 14, 15.) Upon inquiry from the court,

2

Case 7:11-cr-00061-BR   Document 311   Filed 04/21/15   Page 2 of 12

petitioner identified several perceived issues with Manning's representation: the court "selected" Manning to represent petitioner, (id. at 7); Manning is friends with the husband of one of the prosecutors, (id. at 7-8); in one of their meetings, Manning revealed to petitioner confidential information about another client's case, (id. at 8-9); and, petitioner had filed a civil lawsuit against Manning, (id. at 4, 13).

In response, the court explained to petitioner its involvement in the appointment of Manning as counsel. The court noted that given petitioner's inability to get along with first court appointed counsel and his making inappropriate remarks to second appointed counsel (a female), the court suggested that the Federal Public Defender see if Manning could represent petitioner. (Id. at 10.) Next, the court inquired of Manning about his friendship with the prosecutor's husband (who is also an attorney). (Id. at 11.) The court asked Manning, "Do you see any reason that the fact that he's married to the [prosecutor], would in any way compromise your ability to represent your client?" (Id. at 12.) Manning responded, "Not at all[.]" (Id.) When asked about the lawsuit petitioner had supposedly filed against him, Manning stated, "I haven't received any such lawsuit and no, I don't think it's a conflict." (Id. at 14.) Finally, the court asked Manning, "Do you feel like you can give him the representation that you did any other client that you had in this courtroom?" (Id.) Manning answered, "If he'll permit me, yes." (Id.)

When petitioner stated that he did not want Manning to represent him, the court informed petitioner that another lawyer would not be appointed and explained to petitioner that he had the option of representing himself. (Id. at 14-15.) The court further explained the standards to which petitioner would be held if he chose to represent himself and that representing himself was not in his best interest. (Id. at 16-17.) Despite this information, petitioner insisted on representing himself. (See 9/4/12 Tr., DE # 252, at 2-7.)

Considering the circumstances, the court did not abuse its discretion in refusing to appoint another attorney to represent petitioner. First, petitioner's request for new counsel was untimely. At the time of the request, Manning had represented petitioner approximately six months. Also, jury selection was scheduled to begin that same afternoon. Except for the filing of the civil lawsuit, petitioner did not suggest that he had recently become aware of the issues with regard to Manning's representation.

Second, the court thoroughly explored the extent of what petitioner perceived as conflicts with Manning's representation. The court had sufficient information to conclude that a conflict of interest warranting appointment of new counsel did not exist. As such, the court rightly gave petitioner the option of proceeding with Manning or representing himself, with Manning as standby counsel. There being no error on the part of the court, this first claim is meritless.

Next, petitioner claims that by denying his request for a continuance of trial in order to prepare, the court denied him the right to "effectively" represent himself "in a meaningful sense." (Mot., DE # 308-1, at 18.) Petitioner contends that once the court permitted him to proceed *pro* se, the court afforded him only a day in court to prepare for trial. (Id.) According to petitioner, by not allowing him additional time to prepare for trial, the court violated his right of self-representation and prejudiced his right to present evidence on his own behalf. (Id. at 21.)

Whether to grant a continuance of trial rests within the discretion of the court. United States v. Williams, 445 F.3d 724, 738-39 (4th Cir. 2006). A defendant's rights are violated only if the court unreasonably and arbitrarily "insist[s] upon expeditiousness in the face of a justifiable request for delay." Morris v. Slappy, 461 U.S. 1, 11-12 (1983) (internal quotation marks and citation omitted).

4

Here, as discussed previously, on the day of arraignment, 4 September 2012, the court permitted petitioner to proceed *pro se*, with Manning as standby counsel. Petitioner expressed the need for his case file. (9/4/12 Tr., DE # 253, at 18.) Even though Manning indicated that he provided petitioner with all discovery and documents filed by the government, the court directed Manning to make another copy of the materials and provide them to petitioner. (Id. at 19-20, 24.) Manning brought those materials to court to provide to petitioner on the afternoon of 4 September 2012. (9/4/12 Tr., DE # 252, at 7, 102.) On that same day, petitioner also requested that the trial be continued to allow him additional time to prepare for trial. (9/4/12 Tr., DE # 253, at 22-23.) The court denied the request, noting that Manning would provide petitioner with a copy of his case file and that petitioner would have the file in plenty of time before the trial began. (Id. at 23-24.)

The only other proceeding which occurred that same day, i.e., 4 September 2012, was jury selection; opening statements and the presentation of evidence did not begin until nearly a week later, on 10 September 2012. Therefore, contrary to petitioner's contention, he had more than a day to prepare. It was not unreasonable for the court to deny petitioner's belated request to continue the trial. Therefore, the court concludes that this habeas corpus claim is meritless.

Petitioner's third claim concerns his being in full restraints throughout the trial. He asserts that the physical restrictions placed on him deprived him of the right to effectively represent himself and prejudiced his right to a presumption of innocence. (Mot., DE # 308-1, at 23, 28.)

As the Fourth Circuit has recognized:

> Basic to American jurisprudence is the principle that an accused, despite his previous record or the nature of the pending charges, is presumed innocent until his guilt is established beyond a reasonable doubt by competent evidence. It follows that he is also entitled to the indicia of innocence. In the presence of the

5

jury, he is ordinarily entitled to be relieved of handcuffs, or other unusual
restraints, so as not to mark him as an obviously bad man or to suggest
that the fact of his guilt is a foregone conclusion.

       However, the right to the indicia of innocence is a relative one.
The judge presiding at the trial, the jurors, courtroom personnel and
spectators are entitled to security in the performance of their functions or
in observing the trial. The members of the public out of the courtroom are
entitled to security in the pursuit of their daily activities. The public also
has an interest in the expeditious trial of persons accused of crime, and an
interest in preventing the guilty from being at large and committing other
offenses. Thus, in appropriate circumstances, the accused's right to the
indicia of innocence before the jury must bow to the competing rights of
participants in the courtroom and society at large.

       . . . .

       Unless the district judge's discretion is to be absolute and beyond
review, the reasons for its exercise so as to require special security
measures, must be disclosed in order that a reviewing court may determine
if there was an abuse of discretion. Whenever unusual visible security
measures in jury cases are to be employed, we will require the district
judge to state for the record, out of the presence of the jury, the reasons
therefor and give counsel an opportunity to comment thereon, as well as to
persuade him that such measures are unnecessary.

United States v. Samuel, 431 F.2d 610, 614-15 (4th Cir. 1970) (citations omitted).

Prior to opening statements and outside the presence of the jury, the court stated:

[P]rior to the beginning of the trial on last Tuesday the Court was approached by
the United States marshal and requested to permit the marshal to keep the
defendant in full restraints during the trial of this case.

       I advised the marshal that we -- that that would be permissible
during the jury selection process as the defendant would be -- would
remain at counsel table throughout that time, and the question of whether
he was representing himself had not been fully determined in any event.

       The marshal reported to me the following[] security related
incidents involving the defendant since he's been in federal custody on his
current charges here.

       First, on August 15th, 2011 through October 12th, 2011 the
defendant was housed at FMC Springfield to undergo a psychiatric setting.

       While at FMC Springfield, the defendant was charged with four
disciplinary infractions: (a) destroying government property with a value
of over a hundred dollars; (b) stalking; c) interfering with staff; and (d)
refusing to obey an order.

       Second, on June 11th, 2012 the defendant was being housed at the
Edgecombe County Jail in the custody of the U.S. Marshal Service. On

6

that date at approximately 1705 hours, Beckton exposed himself to staff, pulling down his pants and telling the jail staff to, quote, "kiss his ass."

Third, on August 2nd, 2012 the United States Marshal Service personnel became aware of a possible escape plot the defendant was involved in at the Albemarle District Jail. This plot involved attempting to gain information about the physical layout of the jail and then attempting to extort a correctional officer in order to acquire a cell phone. An investigation revealed the defendant has received excessive information about the physical layout of the jail and had possibly been allowed to make an unauthorized cell phone call.

When questioned about this incident by investigators, the defendant refused to make a statement. The correctional officer in question has since resigned from the jail. Knowledge of this plot prompted the marshal service to move Beckton to the Wake County Jail in order to hinder any escape plans that may have been made at the Albemarle District Jail.

Fourth, on August 13th, 2012 the marshal service was notified by the administrator of the Wake County Jail that the defendant had faked a medical emergency the previous night in order to hopefully be taken to a local hospital for treatment.

A stash of prescription medication was found in the defendant's cell at the Wake County Jail. Wake County Jail staff considered this stash an attempt by Beckton to create another medical emergency that would allow him to be taken to an outside hospital.

This was viewed by the marshal service as an attempt by the defendant to be removed from the jail in order to attempt an escape. Beckton was immediately transferred to the Piedmont Regional Jail.

Those are the incidents that have been related to the Court by the marshal service, leading to the Court's decision to allow him to be maintained in restraints prior to the beginning of the -- prior to the call of the case on last Tuesday.

Following the hearing on Tuesday for jury selection, the marshal service has reported that the defendant was reluctant to leave the courtroom after court had been adjourned; he became very agitated about several motions that he had filed with the Court.

On the way back to the cell block, the defendant became very agitated and began to make numerous negative comments about the presiding judge, referring to him as a, quote, "fucking coward," end quote, and made threats of spitting in his face.

During his expression of anger towards the Court and the presiding judge, the defendant also said, quote, "He's going to get a chair thrown at him," close quote. The defendant also made reference to causing problems in court at his trial during the week of September 10th, 2012.

Now, because of all of these matters brought to the attention of the Court by the United States Marshal, it is the decision of the Court -- and also, the marshal has advised the Court that in order to provide adequate security for the -- those in the courtroom and also, of primary importance, to provide for the safety of the defendant himself, that the marshal recommends the defendant be kept in full restraints throughout the trial of this matter.

7

Now, I may need to address that last issue a little bit more so you yourself, Mr. Beckton, will understand it. Should you become unruly, as you have shown a propensity to do, it would be the duty of the marshal service to secure you in some fashion.

If you're not in full restraints, that may very well result in serious injury to you, either by the use of Tasers or excessive force or adequate force by the marshal service in bringing you into compliance. Therefore, the Court has decided that the marshal's suggestion is appropriate.

And the Court also notes for the record so that the reviewing court, which I'm sure will be called upon to review this decision, can have a better understanding of what the layout is like.

The Court would observe that the defendant is in civilian clothes, that the counsel table where the defendant sits has . . . a barrier on the ends toward the jury box so it does not show the defendant's feet or legs where he is shackled, that the chain that reaches from wherever, I guess around his waist, up to his wrists where the cuffs are is not visible -- I cannot see it even now -- that the only time it's visible is when the defendant may at times reach up and start writing, as he has shown he is fully capable of doing in the condition he is now. I've seen him do it quite a bit earlier and I've seen him do it this morning. The Court is going to direct and I order that there be no difference in presentation by the defendant or the government, that the government attorneys will make their opening statement and other arguments to the jury while seated at counsel table. The defendant will do the same so it won't be any different for the jury.

The Court will instruct the jury on its decision and admonish the jury that it is not to take these additional measures by the Court as any indication at all that the defendant is any way guilty of the charge, that they are to decide the case in exactly the same manner than any other case.

The defendant is entitled to and will have the same presumption of innocence and every other protection provided by the constitution and laws of the United States as any defendant who is not in restraints.

Now, I will at this time allow the defendant and the government to make any comment or observation on the Court's decision.

(9/10/12 Tr., DE # 257, at 6-11.) Petitioner responded with a number of comments about this decision, which essentially amounted to his objection in particular to having to wear handcuffs. (Id. at 11-14.) The court also heard from the government regarding the issue. (Id. at 14-16.) The court stood by its decision to have petitioner placed in restraints and provided limiting instructions to the jury as it indicated to the parties it would do. (See id. at 31.)

Given petitioner's criminal history, infractions and conduct within the prison setting, and conduct within the courthouse (both in and out of the courtroom) and based on consultation with the Marshal Service, the court acted within its discretion in imposing the extra security measure. Any perceived prejudice to petitioner was minimized by the fact that, as the court noted, the jurors could not see any restraints on petitioner except when he raised his hands above the table to write and by the limiting instructions the court gave the jury. The court concludes that neither petitioner's right to self-representation nor his right to the indicia of innocence was violated by his being restrained during trial. Accordingly, this claim is also meritless.

Petitioner's fourth claim pertains to the voir dire of prospective jurors. He contends that the court's refusal to ask all of his proposed questions violated his right to an impartial jury and prevented him from reasonably exercising his peremptory challenges. (Mot., DE # 308-1, at 30.) Petitioner requested that the court ask the following questions of prospective jurors:

1. What is justice?
2. What is judgment?
3. What is a fact?
4. What is preconception?
5. Have you ever been homeless?
6. Do you believe that we, as sinners, have faults within ourselves, should be able to cast judgment upon another person?
7. How do you identify the fact[?]

(DE # 194; see also 9/4/12 Tr., DE # 252, at 46-49.) The court asked question #5 above and ruled that the other questions were not relevant. (9/4/12 Tr., DE # 252, at 49.)

"Voir dire plays an essential role in guaranteeing a criminal defendant's Sixth Amendment right to an impartial jury," and "'enabl[es] the court to select an impartial jury and assist[s] counsel in exercising peremptory challenges.'" United States v. Lancaster, 96 F.3d 734, 738 (4th Cir. 1996) (citations omitted) (alterations in original). A district court possesses wide discretion over the area of juror voir dire. See id. at 738-39.

9

> In the context of cases like this one, in which the proposed voir dire question does not address issues of racial or ethnic prejudice, circuit courts of appeals have held that the district court need not pursue a specific line of questioning on voir dire, provided the voir dire as a whole is reasonably sufficient to uncover bias or partiality in the venire. A district court abuses its discretion, however, if the voir dire does not provide "'a reasonable assurance that prejudice would be discovered if present.'"

Id. at 739-40 (citations and footnote omitted).

Here, petitioner's proposed questions (which the court rejected) are subject to broad interpretation. Answers to those questions would likely have little bearing on a prospective juror's bias or partiality. All the questions the court *did* propound were sufficient to reveal potential bias and prejudice. Therefore, petitioner's right to an impartial jury and his ability to exercise his peremptory challenges were not impaired, and this claim fails.

Petitioner's final claim is based on purported ineffective assistance of appellate counsel. The applicable legal standard for such a claim is well established. "To show a violation of the Sixth Amendment right to effective assistance of counsel, a defendant must prove (1) 'that [his] counsel's performance was deficient' and (2) 'that the deficient performance prejudiced the defense.'" United States v. Baker, 719 F.3d 313, 318 (4th Cir. 2013) (citation omitted) (alteration in original).

> Regarding the first prong, a lawyer's performance is deficient when his representation falls "below an objective standard of reasonableness," as measured against "prevailing professional norms." "[T]he reasonableness of counsel's challenged conduct," in turn, is judged "on the facts of the particular case, viewed as of the time of counsel's conduct." To guard against hindsight bias and unfair "second-guess[ing]," a defendant must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."
> The range of reasonable professional assistance is just as wide on direct appeal as it is at trial. In particular, "[c]ounsel is not obligated to assert all nonfrivolous issues on appeal, as '[t]here can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review.'"

10

> Indeed, requiring counsel to raise every claim, or even a multiplicity of claims, runs the risk of detracting from contentions that may be truly meritorious. Appellate counsel accordingly enjoys a "presumption that he decided which issues were most likely to afford relief on appeal," a presumption that a defendant can rebut "only when ignored issues are clearly stronger than those presented."

Id. (citations omitted) (alterations in original).

To satisfy the second prong of an ineffective assistance of counsel claim, "in the context of appellate representation, a petitioner must establish a 'reasonable probability . . . he would have prevailed on his appeal' but for his counsel's unreasonable failure to raise an issue." United States v. Rangel, No. 13-7445, __ F.3d __, 2015 WL 1454923, at *8 (4th Cir. Apr. 1, 2015) (citations omitted) (omission in original).

In support of his ineffective assistance of counsel claim, petitioner argues that one of the issues counsel raised on appeal was incorrect. He contends that appellate counsel misinterpreted the facts in the record to argue on appeal that this court erred by refusing petitioner's request to testify in narrative form. (Mot., DE # 308-1, at 41.) According to petitioner, if counsel had consulted with him and thoroughly investigated the facts, he would have been aware that petitioner never asked to testify in a narrative form to the jury, but rather he was attempting to ask the court to permit him "to give an exparte [sic] narrative 'to the court' [b]efore the members of the jury are brought back inside the courtroom . . . ." (Id. at 43 (alteration in original).) Counsel's deficiency in this regard allegedly rendered petitioner's appeal meaningless and resulted in other issues not being addressed on appeal. (Id. at 53.)

The court concludes that petitioner cannot show appellate counsel's performance was unreasonable or that it prejudiced petitioner. First, even assuming that counsel misinterpreted the nature of what petitioner was trying to accomplish with his testimony, it was objectively reasonable for him to raise the issue regarding the narrative form of petitioner's trial testimony.

11

The record clearly reveals that the court required petitioner to testify before the jury, if he was going to testify at all, in a question-answer format. Albeit unsuccessful, it was a non-frivolous issue to raise on appeal.

Furthermore, petitioner cannot establish that had appellate counsel raised other issues on appeal, petitioner would have prevailed. The only issue that petitioner contends counsel should have raised on appeal concerns the court's decision to have him restrained throughout trial. (See Mot., DE # 308-1, at 53-57.) For the reasons discussed previously, there is no reasonable probability that had counsel raised this issue on appeal, the Court of Appeals would have concluded that this court abused its discretion in implementing that security measure. Therefore, petitioner cannot satisfy either prong for an ineffective assistance of claim, and this final claim lacks merit.

Because petitioner is not entitled to relief on any claim he asserts, the § 2255 motion is DISMISSED. The court finds that petitioner has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Pursuant to Rule 11(a) of the Rules Governing Section 2255 Proceedings, a certificate of appealability is DENIED.

This 21 April 2015.

_____
W. Earl Britt
Senior U.S. District Judge